UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case No. 1:20-cr-105-PB |
| MICHAEL J. WAGNER, | |
| *Defendant*. | |

**MOTION TO DISMISS THE INDICTMENT
WITH INCORPORATED MEMORANDUM OF LAW**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   RELEVANT BACKGROUND .............................................................................2

     A.    Sources of Information ............................................................................2

     B.    Retired SPD Captain Wagner .................................................................. 3

     C.    The Kroll Investigation ...........................................................................4

           1.    The stated scope .........................................................................4

           2.    Captain Wagner was ordered to cooperate with Kroll or be terminated ....................................................................................5

           3.    Captain Wagner's Kroll interview ..............................................6

     D.    The Criminal Investigation Timeline .....................................................9

           1.    The investigation's origin ..........................................................9

           2.    The investigation evolved ........................................................12

III.  ARGUMENT ......................................................................................................17

     A.    Legal Framework ..................................................................................17

           1.    Garrity immunity .....................................................................17

           2.    The scope of Garrity immunity.................................................18

           3.    The Government's heavy burden ...............................................19

     B.    The Statements Captain Wagner Made During his Kroll interview were Cloaked with Garrity Immunity ................................................... 19

     C.    The Evidence and Witnesses Against Captain Wagner are Tainted .....................21

           1.    There was no effort to prevent access to and use of immunized statements................................................................................21

           2.    The evidence and witnesses are tainted ....................................24

IV.  CONCLUSION...................................................................................................28

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Garrity v. New Jersey*,
  385 U.S. 493 (1967) .......................................................................................... *passim*

*In re Grand Jury Subpoena*
  75 F.3d 446 (9th Cir. 1996) ....................................................................................22

*In re Grand Jury Subpoena (Stover)*,
  40 F.3d 1096 (10th Cir. 1994) ...........................................................................18, 22

*Kastigar v. United States*,
  406 U.S. 441 (1972) .......................................................................................... *passim*

*Oladeinde v. City of Birmingham*,
  230 F.3d 1275 (11th Cir. 2000) ..............................................................................20

*Sher v. U.S. Dep't of Veterans Affairs*,
  488 F.3d 489 (1st Cir. 2007) .......................................................................18, 19, 20

*United States v. North*,
  910 F.2d 843 (D.C. Cir. 1990) (*North I*), *opinion withdrawn in part*, *United
  States v. North*, 920 F.2d 940 (D.C. Cir. 1990) (*North II*) ......................................19

*United States v. Palmquist*,
  712 F.3d 640 (1st Cir. 2013) .......................................................................17, 20, 21

*United States v. Schmidgall*,
  25 F.3d 1523 (11th Cir. 1994) ................................................................................19

*United States v. Serrano*,
  870 F.2d 1 (1st Cir. 1989) .................................................................................27, 28

*United States v. Slough*,
  641 F.3d 544 (D.C. Cir. 2011) ..........................................................................18, 27

**Statutes**

26 U.S.C. § 7206(1) ......................................................................................................17

RSA 37:5 ..........................................................................................................................5

RSA 37:6, II .....................................................................................................................5

RSA 91-A ..........................................................................................................................3

**Other Authorities**

U.S. Const. amend. V.................................................................................................17

3 Crim. Proc., *Applying the use/derivative-use prohibition* § 8.11(c) (4th ed.)...........................19

3 Crim. Proc., *Garrity Immunity* § 8.11(f) (4th ed.) ...............................................................18, 21

## I.      INTRODUCTION

The Government used former Salem Police Department Captain Michael Wagner's compelled statements in violation of the Fifth Amendment. Captain Wagner moves to dismiss the indictment because the Government's conduct—use of compelled statements to focus a criminal investigation then to indict with the resulting tainted evidence—flouted the protection and immunity established in *Garrity v. New Jersey*, 385 U.S. 493 (1967) and in *Kastigar v. United States*, 406 U.S. 441 (1972).

In early 2018, the Town of Salem, New Hampshire engaged Kroll Inc. to investigate the Salem Police Department ("SPD") and its management. Although the Town and Kroll suggested the investigation was limited to reviewing SPD billing and internal affairs practices, the investigation went beyond that. As Kroll revealed in its report, Town Manager Christopher Dillon—at the time, five months into the job as head of all Town departments—originally engaged Kroll to investigate the Town's allegations of SPD insubordination. Those allegations were spawned out of political tension between SPD management and the Town Manager, which intensified significantly under Dillon.

The boiling point was reached when Town Manager Dillon ordered SPD management, which included Captain Wagner, to cooperate with Kroll's investigation and threatened to discipline those who did not. Deputy Chief Robert Morin, Captain Wagner's direct superior, relayed the order to Captain Wagner and told him that refusal to cooperate would result in termination. Captain Wagner followed these orders, and submitted to a nearly three-hour audio-recorded and transcribed interview.

For most of the interview, questioning stayed on the subjects Captain Wagner was told were in focus. At the end of the probe, however, investigators ambushed him with questions about

whether he held a Federal Firearms License (he did not), whether he purchased and resold firearms (he did), and from where (Sig Sauer). The coerced statements Captain Wagner made in response were cloaked with *Garrity* immunity. Despite that immunity, the Government used Captain Wagner's compelled statements and their fruits to investigate and prosecute a tax charge arising from the firearm transactions in violation of his Fifth Amendment right, *Garrity*, and *Kastigar*.

That constitutional violation has tainted the entire case. The Government did nothing to protect against violating Captain Wagner's Fifth Amendment right, despite having reason to know his Kroll interview was involuntary. The Government did not begin investigating Captain Wagner's firearm transactions or tax returns before investigators received his compelled statements. It was only after they the compelled statements that the Government's prosecution team used them to focus an investigation on Captain Wagner and pursue investigatory leads.

The Government's investigation was substantively derived, shaped, altered, and affected by Captain Wagner's immune statements. All of the evidence compiled as a result—firearm transaction records, witness statements, financial records, tax returns—was used to secure the indictment and likely will be used at trial. The case against Captain Wagner was conceived, investigated, and prosecuted in violation of the constitution. Captain Wagner therefore moves for a pre-trial *Garrity*/*Kastigar* evidentiary hearing and for dismissal of the indictment.

## II.    RELEVANT BACKGROUND

### A.    Sources of Information

The information in this memorandum principally comes from two sources. <u>First</u>, the Government produced discovery in this case. The discovery was organized into eight distinct file folders: (1) Grand Jury Records; (2) IRS; (3) Kroll Audit; (4) NH AG Investigation; (5) On Target Gun Receipts for Wagner; (6) Reports; (7) Salem PD Records; and (8) Wagner Statements. The

third file folder, Kroll Audit, contains the audio-recording and transcript of Captain Wagner's compelled Kroll interview. Exhibits bates stamped "WAGNER_" are from the Government's discovery production.

Second, in response to requests made under New Hampshire's Right-to-Know law (RSA 91-A), the New Hampshire Department of Justice, Office of the Attorney General ("NHAG"), produced more than 1,000 documents pertaining to its investigation of Captain Wagner. Exhibits bates stamped with "RTK –" are from the NHAG. Although there is overlap between the NHAG's records and the discovery produced in this case, the NHAG produced records that are exculpatory, relevant for impeachment, and include Captain Wagner's and Government witnesses' prior statements. Some of these records were inexplicably omitted from the federal Government's discovery production.

### B.    Retired SPD Captain Wagner

Captain Wagner served the Town of Salem as a police officer for nearly 20 years. Indictment ¶ 1. During his service, Captain Wagner received numerous commendations, completed extensive training, and served in supervisory and instructor roles. *See id*. ¶ 2. Captain Wagner was especially proficient with firearms and served as the firearms and use-of-force instructor. *See id*. He also spent three years as a member of the regional SWAT team.

After 18 years on the force, on November 19, 2017, Captain Wagner was promoted to the rank of Captain, becoming a member of the SPD management team. Soon after, unfortunately, Captain Wagner's health began to decline at an alarming rate. By spring 2018, Captain Wagner's physicians determined that his kidneys were failing and evaluated his viability for transplantation. Ex. A, Letter from Mount, D., M.D. (Feb. 5, 2020). While serving in SPD management and battling

end-stage kidney disease, Captain Wagner was forced to navigate a power struggle between then long-time SPD Chief, Paul Donovan, and then newly-appointed Town Manager Dillon.

### C.     The Kroll Investigation

#### i.     *The stated scope*.

In **February 2018**, the Town engaged Kroll to investigate the SPD and its management. Ex. B, Report of Investigation (Sept. 18, 2019); Ex. C, Report of Audit (Oct. 12, 2018). Kroll Director Daniel Linskey led the investigation. *See* Ex. C at 9. His team included investigators and Certified Public Accountants. *See id*.

Kroll, acting as the Town's agent, investigated two facets of SPD operations: (1) "time and attendance practices of personnel within the Salem PD"; and (2) "internal affairs investigative practices within the Salem PD." *See id*. at 4, 9. Kroll's findings on those issues were set out in two reports: Report of Investigation, dated September 19, 2018 (time and attendance practices) and Report of Audit, dated October 12, 2018 (internal affairs investigative practices).

But Kroll's investigation went beyond these two issues. The investigation arose from the "*significant* tension between the Salem PD's administration and the town's administration, which ha[d] existed for several years." *See* Ex. C at 9 (emphasis added). In fact, Kroll acknowledged that it was "originally engaged" to investigate the Town Manager's allegations of what Kroll said "could only be described as a complete and utter disregard by Salem PD management of" his "authority as town manager and therefore, Chief Donovan's direct supervisor." *See* Ex. D, Kroll Addendum A (undated) at WAGNER_00002221. Determining whether and to what extent the officers constituting SPD management were insubordinate was thus within the scope of Kroll's investigation. *See id*. Some of Kroll's findings in that regard were summarized in an undated addendum titled, *Culture within the Salem PD. See id*.

ii. *Captain Wagner was ordered to cooperate with Kroll or be terminated*.

Against that backdrop, "Salem PD management was informed by its superior, Town Manager Dillon, to cooperate with Kroll's audit." *Id*.; *see also* RSA 37:5, 37:6, II. Captain Wagner was a member of SPD management subject to Town Manager Dillon's order and one of the five officers that Kroll identified as "key personnel." *See* Ex. C at 4.

Captain Wagner's direct superior, Deputy Chief Morin, confirmed that order and told Captain Wagner that he would be terminated if he refused to follow it. Ex. E, Declaration of Robert Morin ("Morin Decl.") ¶ 23. During what Kroll described as a meeting "to develop an audit plan"—which Deputy Chief Morin and Captain Wagner attended—Town Manager Dillon openly threatened the Deputy Chief with discipline for refusing to produce Internal Affairs records. Ex. C at 12; Morin Decl. ¶ 14. Deputy Chief Morin believed the Town Manager's order to produce those records violated New Hampshire's Right-to-Know law and SPD's collective bargaining agreements. *See* Morin Decl. ¶ 15. Deputy Chief Morin was alarmed by Town Manager Dillon's willingness to risk violating both. *Id*. He feared for his job when Town Manager Dillon threatened to discipline him for not heeding his directive. *Id*. ¶¶ 16, 22. Town Manager Dillon made clear that refusal to cooperate with Kroll would result in termination or severe employment sanctions. *Id*.

Deputy Chief Morin did as the Town Manager ordered. *Id*. ¶ 17. He also directed that Captain Wagner follow the Town Manager's order. *Id*. ¶ 23. That order to Captain Wagner, Deputy Chief Morin recalls, came when he and Captain Wagner were photocopying the Internal Affairs records for Kroll. *See id*. ¶¶ 18, 19. Deputy Chief Morin remembers the frustration of, at the time, feeling that SPD management was breaching the Right-to-Know law and SPD's collective bargaining agreements by making these records available. *See id*. ¶¶ 15, 20. He recalls that Captain Wagner asked him if they actually had to follow the Town Manager's order. *Id*. ¶ 20. Despite his

5

disagreement with the Town Manager and his order, Deputy Chief Morin recalls giving Captain Wagner an unambiguous order: cooperate with Kroll, including during the interview, or be terminated. *See id.* ¶¶ 21, 22, 23.

Captain Wagner submitted to the mandatory interview as ordered. *See id.* ¶ 24; Ex. F, Transcript of Michael J. Wagner Kroll Interview (May 22, 2018) ("Wagner Tr."). So did the others in SPD management. Ex. G, Transcript of Paul Donovan Kroll Interview (May 7, 2018); Ex. H, Transcript of Robert Morin Kroll Interview (May 7, 2018); Ex. I, Transcript of Joel Dolan (May 31, 2018).

> ### iii.  *Captain Wagner's Kroll interview*.

On **May 22, 2018**, Captain Wagner submitted to the mandatory audio-recorded and transcribed interview. *See generally* Ex. G, Wagner Tr. Mr. Linskey led the interview, describing its purpose to Captain Wagner as one to further Kroll's work

> with [the] Salem Police Department to conduct an audit into two phases of daily operations, one is the time and attendance program at Salem PD and the other is an audit of the internal affairs program at Salem PD.

*Id.* 2:14–17. Mr. Linskey made virtually identical remarks about Kroll's purpose when he and his team interviewed Deputy Chief Morin and Captain Dolan. *See* Ex. H, 2:12–19; Ex. I 2:16–21. While he also provided a similar opening statement when interviewing SPD Administrative Officer Basil Chingros—the only officer interviewed not in SPD management and therefore not a target of Kroll's investigation—Mr. Linskey's remarks to Chingros diverged in a material respect:

> Linskey: Good afternoon, umm, let me get my glasses on. They don't work if I just lay them on the side. Umm, today's date is Friday, June 8th [2018]. It is 2:15. We're at Salem Police, New Hampshire, Massachusetts [*sic*]. I'm Dan Linskey from Kroll. Kroll has been retained to do an audit and review of two issues. One are [*sic*] time and attendance practices at Salem PD and the second is the IAD—the internal affairs process. *We are not doing an internal affairs investigation. There's no discipline that can come out of this. I'm not gonna give you a Garrity or anything. We're just getting information. So that is the tenor and tone of the assessment.*

*See* Ex. J, Transcript of Basil Chingros Kroll Interview (June 8 2018) (emphasis added); Ex. K, Declaration of Sharon Willier (Oct. 1, 2021). No reference to *Garrity* or discipline was made during Captain Wagner's interview. *See generally* Wagner Tr.

Mr. Linskey and his colleague questioned Captain Wagner for nearly three hours, without a break. *See generally* Wagner Tr. The interview covered Captain Wagner's training and experience over the years, including his various promotions and responsibilities at SPD. *See generally id.* Mr. Linskey questioned Captain Wagner about his role in Internal Affairs investigations and the procedures SPD used to conduct them. *See id.* Mr. Linskey asked Captain Wagner about specific Internal Affairs investigations, including one involving him, as well as time and attendance issues. *See id.* When Mr. Linskey finished his questions about the subjects Captain Wagner was told they would cover, however, the interview did not end. *See id.* 146:2-6.

The interview instead shifted to a probe of Captain Wagner's personal conduct. *See id.* 148:1–7. It started with questions about a vehicle purchase:

| | |
|---|---|
| Linskey: | Two -- I think two finishing questions, we'll hopefully get you out of here by 1. Obviously, tons of people are calling with all the -- their versions of events, their thoughts, their ideas, their concerns, their issues, their corruptions. |
| Wagner: | Exactly what I was saying, yeah. |
| Linskey: | . . . There was a question or issue about cars that came up and there was an allegation that there was an auction . . . and that you benefited from the auction. |
| Wagner: | It wasn't an auction, I don't think. |
| Linskey: | It was some type of bid that went out, the BP bought the cars, did you wind up getting one of the cars that was a former police car? |
| Wagner: | I'm going to share this with you, this is my personal business, -- |
| Linskey: | Sure. |

Wagner:          -- but I'll share this part with you just so you understand why I say that. I bought what turned out to be, what was one of our police cars from BP, private sale, he owned the vehicle, I bought it from him. You may not like the optics of it but yeah, I did buy a car from him.

                                              . . .

Linksey:         . . . And that's, you know, maybe they're all sharing this rumor and everyone wants to -- and a lot of people have this impression that Kroll is going to open up all kinds of independent investigations, we're looking at the process, but it – it does go to, you know, people tell us things, we're like all right well, is this person legitimate or not legitimate, so we're just trying to verify some of the information.

Linskey:         . . . This is another and you can answer it, not answer it, whatever, are you a federal law -- firearms licensed dealer?

Wagner:          Nope.

Linskey:         Have you purchased a number of guns from Smith and Wesson?

Wagner:          I've never purchased a gun from Smith and Wesson.

Linskey:         Okay. So we were told the Smith and Wesson -- or Sig Sauer.

Wagner:          Sig Sauer.

Linskey:         Okay. That there's a police discount rate and that you purchased a number of weapons and then resold them.

Wagner:          Again, that's my private business.

Linskey:         Okay.

Wagner:          I didn't -- I'll -- I'll tell you this much. I've been a -- into firearms my entire life, I know the firearms laws well, I have a close friend who's an FFL, and I have never violated a firearms law.

Linskey:         And I don't think there was any allegation, let me just be clear, no one said you violated a firearms law.

Wagner:          Well, Dan, listen, this -- this stuff is my private life and clearly there's -- there are moles in here that are feeding you this information because that can only -- anything about my private life can only come out of here.

Linskey:         I -- I -- and that's -- I -- I preface it with that, --

8

| Wagner: | Yeah. |
| Linskey: | -- that people are feeding information and saying this that and the other. |
| Wagner: | So, I'll -- I'll preface with -- that with, it's none of their damn business. |
| Linksey: | Roger that. Anything we should have asked, we missed on, anything we should know relative to this? |
| Wagner: | I mean no, I mean, not without you asking me the question, I don't know what you're thinking. |
| Linskey: | Okay. |

Wagner Tr. 146:2–25; 147:13–25; 148:1–25; 149:1–10. The interview concluded without Mr.

Linskey asking another substantive question. *See id.* 149:10–25; 150:1–25.

### D.    The Criminal Investigation Timeline

#### 1.    *The investigation's origin*.

Kroll interviewed Captain Wagner on **May 22, 2018**. It completed its reports on

**September 19, 2018** (time and attendance practices) and **October 12, 2018** (internal affairs

practices). Ex. B; Ex. C. The addendum is not dated. *See* Ex. D.

On **November 21, 2018**, the Town published only the redacted copies of the Kroll reports

and the addendum on its website.[1] The Kroll reports and addendum revealed that Kroll

investigators interviewed SPD officers. Ex. B; Ex. C; Ex. D. The interview transcripts, however,

were not released at that time.

On **November 30, 2018**, a Rockingham County Grand Jury subpoenaed from the Town

---

[1]    *See* Town of Salem, New Hampshire, *Police Audit* (Nov. 21, 2018), *available at* https://www.townofsalemnh.org/home/news/police-audit (last accessed Oct. 4, 2021).

> [t]he complete un-redacted audit report prepared by Kroll, a division of Duff & Phelps, for the Town of Salem concerning the Salem Police Department and all supporting investigative materials and data.

Ex. L, Rockingham County Grand Jury, Subpoena *Duces Tecum* (Nov. 30, 2018). Senior Assistant Attorney General Geoffrey Ward issued the subpoena to the Town that day. *See id*.

On **December 3, 2018**, Town Manager Dillon emailed Senior Assistant Attorney General Ward about that subpoena:

> I spoke to Daniel Linskey from Kroll this weekend about the documents relative to the Subpoena Duces Tecum. He will work on coping [*sic*] all documents relative to the audit report *inclusive of transcripts of interviews*, *recordings of interviews*, and any supporting documentation.

Ex. M, Email from Dillon, C. to Ward, G. (Dec. 3, 2018) (emphasis added).

On **December 4, 2018**, in response to the subpoena, the Town produced unredacted copies of the Kroll reports and the addendum to Senior Assistant Attorney General Ward. Ex. N, Email from Broth, M. to Ward, G. (Dec. 4, 2018).

On **December 13, 2018**, Town Manager Dillon emailed Senior Assistant Attorney General Ward to say he now had "a link from Kroll regarding *transcripts of conversations* and other supporting documents" ready for production in response to the subpoena. Ex. O, Email from Dillon, C. to Ward, G. (Dec. 13, 2018) (emphasis added).

On **January 14, 2019**, Town Manager Dillon and SPD Civilian Administrator Brian Pattullo met with Senior Assistant Attorney General Ward "and several other investigators." Ex. P, Letter from Pattullo, B. to former Attorney General MacDonald, G. (May 23, 2019). The purpose of that meeting was "to discuss the Kroll audit and to provide information regarding *issues raised by the Kroll report in the area of* internal affairs *and other potential criminal activity* by members of the Salem Police Department." *Id*. (emphasis added).

Three days after that meeting, on **January 17, 2019**, the NHAG notified the Town that Deputy Chief Morin was under criminal investigation. *See id*. Deputy Chief Morin was placed on administrative leave. Morin Decl. ¶ 27. The NHAG has since declined to prosecute him. *Id*. ¶ 28.

On **February 6, 2019**, Town Manager Dillon forwarded an email he received from Kroll personnel to NHAG Investigator Scott Gilbert. Ex. Q, Email from Dillon, C. to Gilbert, S. (Feb. 6, 2019). The email from Kroll included a file transfer link. *See id*. The files transferred were "[c]opies of audio recordings of interviews between Kroll and PD personnel (approximately 9)" and "[t]ranscripts of those same audio recordings, as applicable." *Id*.

*On the next day*, **February 7, 2019**, apparently in response to his request, Investigator Gilbert received an email from Sig Sauer with a document detailing Captain Wagner's firearm purchase history. Ex. R, Emails between Gilbert, S., Anderson, J., and Annicelli, A. (Feb. 7, 8, 2019). That document included Captain Wagner's order numbers, and the dates and types of firearms purchased. *See id*. at RTK Wagner–000819.

*The next morning*, on **February 8, 2019**, Investigator Gilbert obtained more information about Captain Wagner's Sig Sauer purchases. *See id*. Sig Sauer's Director of Regulatory Affairs, Jeff Anderson, provided Investigator Gilbert a spreadsheet titled "MW 2019 full data set.xlsx." *See id*. at RTK Wagner–000822. The spreadsheet identified the firearms Captain Wagner purchased, and included information about the unit selling price, the list price, whether a discount was applied, the value of that discount, the total number of firearms purchased, and the total amount saved as a result of the discounts applied. *See id*. RTK Wagner–000825.

11

| Order | Line | Ordered Item | Qty | UOM | Unit Selling Price | Price List | List Price | Net discount $ | Request Date | Warehouse | POS # | Discount? | Discount percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 717487 | 3.1 | R716-16B-P | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 12/23/2012 22:09 | PRO | 5216 | IOP / Salem | 25% |
| 717487 | 1.1 | R716-16B-P-ODG | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 12/23/2012 22:09 | PRO | 5216 | IOP / Salem | 25% |
| 717487 | 2.1 | RM400-16B-EC-ODG | 1 | EA | $925.50 | PRO SHOP | $1,234.00 | $308.50 | 12/23/2012 22:09 | PRO | 5216 | IOP / Salem | 25% |
| 720065 | 2.1 | R716-16B-P | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 12/26/2012 22:09 | PRO | 5357 | IOP / Salem | 25% |
| 720065 | 1.1 | R716-16B-P-ODG | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 12/26/2012 22:09 | PRO | 5357 | IOP / Salem | 25% |
| 721309 | 1.1 | RM400-16B-EC | 1 | EA | $925.50 | PRO SHOP | $1,234.00 | $308.50 | 12/28/2012 22:09 | PRO | 5596 | IOP / Salem | 25% |
| 721309 | 3.1 | RM400-16B-EC | 1 | EA | $925.50 | PRO SHOP | $1,234.00 | $308.50 | 12/28/2012 22:09 | PRO | 5596 | IOP / Salem | 25% |
| 721309 | 2.1 | RM400-16B-EC-FDE | 1 | EA | $945.00 | PRO SHOP | $1,260.00 | $315.00 | 12/28/2012 22:09 | PRO | 5596 | IOP / Salem | 25% |
| 721432 | 1.1 | R716-16B-P | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 12/29/2012 22:09 | PRO | 5715 | IOP / Salem | 25% |
| 721432 | 2.1 | R716-16B-P | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 12/29/2012 22:09 | PRO | 5715 | IOP / Salem | 25% |
| 721432 | 5.1 | RM400-16B-EC | 1 | EA | $925.50 | PRO SHOP | $1,234.00 | $308.50 | 12/29/2012 22:09 | PRO | 5715 | IOP / Salem | 25% |
| 721432 | 3.1 | RM400-16B-EC-FDE | 1 | EA | $945.00 | PRO SHOP | $1,260.00 | $315.00 | 12/29/2012 22:09 | PRO | 5715 | IOP / Salem | 25% |
| 721432 | 4.1 | RM400-16B-EC-FDE | 1 | EA | $945.00 | PRO SHOP | $1,260.00 | $315.00 | 12/29/2012 22:09 | PRO | 5715 | IOP / Salem | 25% |
| 721569 | 3.1 | RM400-16B-EC | 1 | EA | $925.50 | PRO SHOP | $1,234.00 | $308.50 | 12/30/2012 22:09 | PRO | 5762 | IOP / Salem | 25% |
| 721569 | 1.1 | RM400-16B-EC-FDE | 1 | EA | $945.00 | PRO SHOP | $1,260.00 | $315.00 | 12/30/2012 22:09 | PRO | 5762 | IOP / Salem | 25% |
| 721569 | 2.1 | RM400-16B-EC-FDE | 1 | EA | $945.00 | PRO SHOP | $1,260.00 | $315.00 | 12/30/2012 22:09 | PRO | 5762 | IOP / Salem | 25% |
| 722229 | 2.1 | RM400-16B-EC | 1 | EA | $925.50 | PRO SHOP | $1,234.00 | $308.50 | 12/31/2012 22:09 | PRO | 5816 | IOP / Salem | 25% |
| 722229 | 1.1 | RM400-16B-EC-ODG | 1 | EA | $925.50 | PRO SHOP | $1,234.00 | $308.50 | 12/31/2012 22:09 | PRO | 5816 | IOP / Salem | 25% |
| 727072 | 4.1 | R716-16B-P | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 1/8/2013 16:54 | PRO | 5931 | IOP / Salem | 25% |
| 727072 | 3.1 | R716-16B-P-ODG | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 1/8/2013 16:54 | PRO | 5931 | IOP / Salem | 25% |
| 727931 | 2.1 | R716-16B-P-FDE | 1 | EA | $1,629.00 | PRO SHOP | $2,172.00 | $543.00 | 1/9/2013 22:09 | PRO | 6139 | IOP / Salem | 25% |
| 727931 | 3.1 | R716-16B-P-FDE | 1 | EA | $1,629.00 | PRO SHOP | $2,172.00 | $543.00 | 1/9/2013 22:09 | PRO | 6139 | IOP / Salem | 25% |
| 727931 | 4.1 | R716-16B-P-FDE | 1 | EA | $1,629.00 | PRO SHOP | $2,172.00 | $543.00 | 1/9/2013 22:09 | PRO | 6139 | IOP / Salem | 25% |
| 727931 | 1.1 | RM400-16B-EC-FDE | 1 | EA | $945.00 | PRO SHOP | $1,260.00 | $315.00 | 1/9/2013 22:09 | PRO | 6139 | IOP / Salem | 25% |
| 729509 | 1.1 | R716-16B-P | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 1/11/2013 22:10 | PRO | 6378 | IOP / Salem | 25% |
| 729509 | 2.1 | R716-16B-P | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 1/11/2013 22:10 | PRO | 6378 | IOP / Salem | 25% |
| 729509 | 3.1 | R716-16B-P | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 1/11/2013 22:10 | PRO | 6378 | IOP / Salem | 25% |
| 729509 | 4.1 | R716-16B-P | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 1/11/2013 22:10 | PRO | 6378 | IOP / Salem | 25% |
| 729668 | 1.1 | R716-16B-P-FDE | 1 | EA | $2,172.00 | PRO SHOP | $2,172.00 | $0.00 | 1/12/2013 22:10 | PRO | 6528 | None | N/A |
| 729668 | 2.1 | R716-16B-P-FDE | 1 | EA | $2,172.00 | PRO SHOP | $2,172.00 | $0.00 | 1/12/2013 22:10 | PRO | 6528 | None | N/A |
| 732413 | 1.1 | R716-16B-P | 1 | EA | $2,132.00 | PRO SHOP | $2,132.00 | $0.00 | 1/16/2013 22:10 | PRO | 6888 | None | N/A |
| 732413 | 2.1 | R716-16B-P | 1 | EA | $2,132.00 | PRO SHOP | $2,132.00 | $0.00 | 1/16/2013 22:10 | PRO | 6888 | None | N/A |
| 734132 | 1.1 | R516G2-16B-P | 1 | EA | $1,666.00 | PRO SHOP | $1,666.00 | $0.00 | 1/20/2013 22:09 | PRO | 6888 | None | N/A |
| 734354 | 2.1 | R516G2-16B-P | 1 | EA | $1,666.00 | PRO SHOP | $1,666.00 | $0.00 | 1/20/2013 22:09 | PRO | 7128 | None | N/A |
| 734354 | 1.1 | R516G2-16B-P | 1 | EA | $1,666.00 | PRO SHOP | $1,666.00 | $0.00 | 1/20/2013 22:09 | PRO | 7308 | None | N/A |
| 736292 | 1.1 | R516G2-16B-P-ODG | 1 | EA | $1,666.00 | PRO SHOP | $1,666.00 | $0.00 | 1/22/2013 22:08 | PRO | 7459 | None | N/A |
| | | | 36 | | | | | $12,074.50 | | | | | |

RTK Wagner - 000825

Six business days later, on **February 14, 2019**, "[b]ased on the information . . . received and reviewed to date," the NHAG expanded its criminal investigation of the SPD to include Captain Wagner. Ex. S, Letter from Ward, G. to Dillon, C. (Feb. 14, 2019).

On **February 15, 2019**, the SPD put Captain Wagner on administrative leave pending the outcome of the criminal investigation. *See* Ex. P.

## 2. *The investigation evolved*.

Nine business days after the NHAG expanded its criminal investigation to include Captain Wagner, the federal Government's investigators joined in.

On **February 25, 2019**, ATF Special Agent John Cook analyzed the results of a Federal Firearms Licensing System Query. Ex. T, ATF Reports of Investigation Nos. 1–5 at Report No. 2. He concluded that Captain Wagner never has been a Federal Firearms Licensee ("FLL"). *Id.*

On **February 27, 2019**, ATF Special Agent John Cook wrote a report of investigation concerning Captain Wagner's "Sig Academy Suspicious Purchases." *Id.* at Report No. 1. The report was written based on his "Receipt of Information." *Id.* He described "a series of suspicious firearm purchases" made by Captain Wagner in December 2012 and January 2013. *See id.* He analyzed completed ATF Forms 4473, Sig Sauer invoices, and Sig Sauer receipts for Captain Wagner's purchases, as well as the same spreadsheet Sig Sauer created for Investigator Gilbert:

| Order | Line | Ordered Item | Qty | UOM | Unit Selling Price | Price List | List Price | Net discount $ | Request Date | Warehouse | POS # | Discount? | Discount percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 717487 | 3.1 | R716-16B-P | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 12/23/2012 22:09 | PRO | 5216 | IOP / Salem | 25% |
| 717487 | 1.1 | R716-16B-P-ODG | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 12/23/2012 22:09 | PRO | 5216 | IOP / Salem | 25% |
| 717487 | 2.1 | RM400-16B-EC-ODG | 1 | EA | $925.50 | PRO SHOP | $1,234.00 | $308.50 | 12/23/2012 22:09 | PRO | 5216 | IOP / Salem | 25% |
| 720065 | 2.1 | R716-16B-P | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 12/26/2012 22:09 | PRO | 5357 | IOP / Salem | 25% |
| 720065 | 1.1 | R716-16B-P-ODG | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 12/26/2012 22:09 | PRO | 5357 | IOP / Salem | 25% |
| 721309 | 1.1 | RM400-16B-EC | 1 | EA | $925.50 | PRO SHOP | $1,234.00 | $308.50 | 12/28/2012 22:09 | PRO | 5596 | IOP / Salem | 25% |
| 721309 | 3.1 | RM400-16B-EC | 1 | EA | $925.50 | PRO SHOP | $1,234.00 | $308.50 | 12/28/2012 22:09 | PRO | 5596 | IOP / Salem | 25% |
| 721309 | 2.1 | RM400-16B-EC-FDE | 1 | EA | $945.00 | PRO SHOP | $1,260.00 | $315.00 | 12/28/2012 22:09 | PRO | 5596 | IOP / Salem | 25% |
| 721432 | 1.1 | R716-16B-P | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 12/29/2012 22:09 | PRO | 5715 | IOP / Salem | 25% |
| 721432 | 2.1 | R716-16B-P | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 12/29/2012 22:09 | PRO | 5715 | IOP / Salem | 25% |
| 721432 | 5.1 | RM400-16B-EC | 1 | EA | $925.50 | PRO SHOP | $1,234.00 | $308.50 | 12/29/2012 22:09 | PRO | 5715 | IOP / Salem | 25% |
| 721432 | 3.1 | RM400-16B-EC-FDE | 1 | EA | $945.00 | PRO SHOP | $1,260.00 | $315.00 | 12/29/2012 22:09 | PRO | 5715 | IOP / Salem | 25% |
| 721432 | 4.1 | RM400-16B-EC-FDE | 1 | EA | $945.00 | PRO SHOP | $1,260.00 | $315.00 | 12/29/2012 22:09 | PRO | 5715 | IOP / Salem | 25% |
| 721569 | 3.1 | RM400-16B-EC | 1 | EA | $925.50 | PRO SHOP | $1,234.00 | $308.50 | 12/30/2012 22:09 | PRO | 5762 | IOP / Salem | 25% |
| 721569 | 1.1 | RM400-16B-EC-FDE | 1 | EA | $945.00 | PRO SHOP | $1,260.00 | $315.00 | 12/30/2012 22:09 | PRO | 5762 | IOP / Salem | 25% |
| 721569 | 2.1 | RM400-16B-EC-FDE | 1 | EA | $945.00 | PRO SHOP | $1,260.00 | $315.00 | 12/30/2012 22:09 | PRO | 5762 | IOP / Salem | 25% |
| 722229 | 2.1 | RM400-16B-EC | 1 | EA | $925.50 | PRO SHOP | $1,234.00 | $308.50 | 12/31/2012 22:09 | PRO | 5816 | IOP / Salem | 25% |
| 722229 | 1.1 | RM400-16B-EC-ODG | 1 | EA | $925.50 | PRO SHOP | $1,234.00 | $308.50 | 12/31/2012 22:09 | PRO | 5816 | IOP / Salem | 25% |
| 727072 | 4.1 | R716-16B-P | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 1/8/2013 16:54 | PRO | 5931 | IOP / Salem | 25% |
| 727072 | 3.1 | R716-16B-P-ODG | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 1/8/2013 16:54 | PRO | 5931 | IOP / Salem | 25% |
| 727931 | 2.1 | R716-16B-P-FDE | 1 | EA | $1,629.00 | PRO SHOP | $2,172.00 | $543.00 | 1/9/2013 22:09 | PRO | 6139 | IOP / Salem | 25% |
| 727931 | 3.1 | R716-16B-P-FDE | 1 | EA | $1,629.00 | PRO SHOP | $2,172.00 | $543.00 | 1/9/2013 22:09 | PRO | 6139 | IOP / Salem | 25% |
| 727931 | 4.1 | R716-16B-P-FDE | 1 | EA | $1,629.00 | PRO SHOP | $2,172.00 | $543.00 | 1/9/2013 22:09 | PRO | 6139 | IOP / Salem | 25% |
| 727931 | 1.1 | RM400-16B-EC-FDE | 1 | EA | $945.00 | PRO SHOP | $1,260.00 | $315.00 | 1/9/2013 22:09 | PRO | 6139 | IOP / Salem | 25% |
| 729509 | 1.1 | R716-16B-P | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 1/11/2013 22:10 | PRO | 6378 | IOP / Salem | 25% |
| 729509 | 2.1 | R716-16B-P | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 1/11/2013 22:10 | PRO | 6378 | IOP / Salem | 25% |
| 729509 | 3.1 | R716-16B-P | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 1/11/2013 22:10 | PRO | 6378 | IOP / Salem | 25% |
| 729509 | 4.1 | R716-16B-P | 1 | EA | $1,599.00 | PRO SHOP | $2,132.00 | $533.00 | 1/11/2013 22:10 | PRO | 6378 | IOP / Salem | 25% |
| 729668 | 1.1 | R716-16B-P-FDE | 1 | EA | $2,172.00 | PRO SHOP | $2,172.00 | $0.00 | 1/12/2013 22:10 | PRO | 6528 | None | N/A |
| 729668 | 2.1 | R716-16B-P-FDE | 1 | EA | $2,172.00 | PRO SHOP | $2,172.00 | $0.00 | 1/12/2013 22:10 | PRO | 6528 | None | N/A |
| 732413 | 2.1 | R716-16B-P | 1 | EA | $2,132.00 | PRO SHOP | $2,132.00 | $0.00 | 1/16/2013 22:10 | PRO | 6888 | None | N/A |
| 732413 | 2.1 | R716-16B-P | 1 | EA | $2,132.00 | PRO SHOP | $2,132.00 | $0.00 | 1/16/2013 22:10 | PRO | 6888 | None | N/A |
| 734132 | 1.1 | R516G2-16B-P | 1 | EA | $1,666.00 | PRO SHOP | $1,666.00 | $0.00 | 1/20/2013 0:49 | PRO | 6888 | None | N/A |
| 734354 | 2.1 | R516G2-16B-P | 1 | EA | $1,666.00 | PRO SHOP | $1,666.00 | $0.00 | 1/20/2013 22:09 | PRO | 7128 | None | N/A |
| 734354 | 1.1 | R516G2-16B-P | 1 | EA | $1,666.00 | PRO SHOP | $1,666.00 | $0.00 | 1/20/2013 22:09 | PRO | 7308 | None | N/A |
| 736292 | 1.1 | R516G2-16B-P-ODG | 1 | EA | $1,666.00 | PRO SHOP | $1,666.00 | $0.00 | 1/22/2013 22:08 | PRO | 7459 | None | N/A |

WAGNER_00006217

*See id.* Special Agent Cook also identified the credit cards used to purchase the firearms. *See id.*

On **February 28, 2019**, Special Agent Cook determined that Ryan Reynolds of Laurel, Maryland, had a firearm originally purchased by Captain Wagner. *See id.* at Report No. 3.

On **March 14, 2019**, Special Agent Cook determined that Ryan Reynolds's firearm was sent to a former Maryland-based FFL, Constitutional Firearms, by "On Target Guns (FFL), located at 6 Debbie Drive Pelham, New Hampshire." *See id.* at Report No. 4.

On **March 21, 2019**, Investigator Gilbert and Special Agent Cook interviewed the owner of On Target Guns, Deputy Sheriff Gary Fisher. Ex. U, NHAG Report of Investigation (Mar. 22, 2019); Ex. T at Report No. 5. According to Special Agent Cook, Deputy Sheriff Fisher was reluctant to provide information about Captain Wagner. Ex. T at Report No. 5. And when Deputy Sheriff Fisher asked investigators whether their questions "had anything to do with the current state investigation into the Salem Police Department," Special Agent Cook stated only that he was "focused on" Captain Wagner and that Investigator Gilbert was with the NHAG. *See id.*

Although Deputy Sheriff Fisher preferred to "stay out of the investigation," he ultimately answered the investigators' questions. *See id.* He told investigators that when Captain Wagner briefly sold firearms, he did so at a time when the "demand for AR style rifles was very high." *Id.* That demand meant Sig Sauer firearms were "selling for twice their normal retail value." *Id.* Deputy Sheriff Fisher stated that Captain Wagner sold only "for a brief period of time" and did so through the Deputy Sheriff, who used his FFL to transfer the firearms to buyers, including Ryan Reynolds. *See id.*

Deputy Sheriff Fisher stated that Captain Wagner used the Sig Sauer law enforcement discount to purchase firearms. *Id.* Deputy Sheriff Fisher also bought firearms for resale from Sig Sauer, but claimed he did not use the discount program. *See id.* Deputy Sheriff Fisher stated that the discount program was abused and that Sig Sauer knew it. *See id.* He told investigators that Captain Wagner profited from his firearm sales because of the demand. *Id.* Deputy Sheriff Fisher stated that, contrary to what Captain Wagner told Kroll investigators, Deputy Sheriff Fisher did

14

not view him as a close "friend." *See id.*; *see also* Wagner Tr. 148:13–16. Special Agent Cook and

Investigator Gilbert took Deputy Sheriff Fisher's Acquisition & Disposition log book and received

invoices of the transfer transactions involving Captain Wagner. Ex. T at Report No. 5. Investigator

Gilbert described Deputy Sheriff Fisher's records as revealing that Captain Wagner engaged in the

"*repetitive* purchase of firearms for purpose of resale"—a description later adopted by the

Indictment. *See* Ex. U; *see also* Indictment ¶¶ 3–6 ("WAGNER's *Repetitive* Purchase and Sale of

Assault Rifles for Profit") (emphasis added).

On **April 1, 2019**, Special Agent Cook sent his reports to Investigator Gilbert, FBI Special

Agent Kathryn Thibault, and Assistant U.S. Attorney Neil Gallagher. Ex. V, Emails from Cook,

J. to Gallagher, N., et al. (Apr. 1, 2019). An hour later, Special Agent Cook provided a spreadsheet

summarizing the "data [] received from receipts, ATF Form 4473s, and the A&D book from On

Target Guns." *Id.* Two hours after that, he sent another email, adding IRS Special Agent Daniel

Fornash as a recipient, and asking that AUSA Gallagher answer a "Conspiracy Question":

> Sorry to pepper you with a question, but something occurred to us today. Many of
> the firearm sales that WAGNER made occurred in 2013. If he earned that income
> in 2013, he would have to report it on his tax returns in 2014. If he failed to do so,
> the statute of limitations for the tax violation is 6 years (2020). But if the not paying
> taxes is considered part of the same criminal conspiracy of dealing firearms without
> a license . . . would that extend the statute of limitations on the gun crime out too.
> At the minimum, would it extend it out five years from the last act of the conspiracy
> (Tax Day 2019)?
>
> *Sorry you have to hit the ground running on this.*

*See id.* at RTK–000833 (emphasis added). The prosecution team was strategizing how it still could

charge Captain Wagner under the Gun Control Act despite the expired limitations period. *See id.*

Captain Wagner's tax returns, and the longer limitation period for tax crimes, therefore came into

focus. *See id.*

To that end, the day after these emails, on **April 2, 2019**, the Government obtained Captain Wagner's returns for tax years 2013–2017. *See* Ex. W, U.S. Individual Income Tax Return (2013).

On **April 5, 2019**, Deputy Sheriff Fisher testified before the Rockingham County Grand Jury. NHAG attorneys questioned him about Captain Wagner's firearm transactions. Ex. X, Transcript of Gary Fisher's N.H. Grand Jury Testimony (Apr. 5, 2019). Most questions involved reviewing On Target Gun's Acquisition & Disposition log book. *See id.* Deputy Sheriff Fisher also was asked whether he considered Captain Wagner a friend, echoing Captain Wagner's compelled statements to Kroll investigators. *Id.* 171:12–17; *see also* Wagner Tr. 149:1–10. Deputy Sheriff's grand jury testimony was released to the federal Government on June 4, 2019.

On **April 26, 2019**, Investigators Gilbert and NHAG Investigator James O. Kinney continued obtaining information from SPD. In his report, Investigator Kinney acknowledged that NHAG should not receive information SPD obtained directly from Captain Wagner. Ex. Y, Investigation Report (Apr. 26, 2019).

Through **May and June 2019**, the Government subpoenaed and obtained records from Captain Wagner's banking institutions. *See* Ex. Z, Letters from Banks. These records are of the credit cards and financial accounts connected to Captain Wagner's firearm transactions. *See id.*

On **June 28, 2019**, Captain Wagner participated in a proffer, subject to federal and state proffer agreements, concerning the firearm transactions and tax evidence that the Government already had compiled. Ex. AA, Letter from Gallagher, N. to Keefe, C. (June 29, 2019); Ex. BB, Letter from Ward, G. to Keefe, C. (June 28, 2019); Ex. CC, Transcript of Wagner Proffer (June 28, 2019). On the federal side were ATF Special Agent Cook, FBI Special Agent Thibault, FBI Special Agent Wesley Garland, and IRS Special Agent Fornash. *Id.* On the state side were

Investigator Gilbert, Deputy Attorney General Jane Young, Senior Assistant Attorney General Ward, and Assistant Attorney General John Kennedy. *Id*.

In a **November 22, 2019** memorandum of interview, IRS Special Agent Fornash reported on a meeting he and Investigator Gilbert had with SPD officials about "expenditures officers for Salem Police Department had to incur" and questions pertaining to the deductions Captain Wagner claimed on his tax return. Ex. DD, Memorandum of Interview (Nov. 22, 2019).

On **July 1, 2020**, Captain Wagner was indicted. The single-count indictment alleges that Captain Wagner willfully filed a false tax return for tax year 2013 in violation of 26 U.S.C. § 7206(1) by allegedly failing to report income derived from his firearm transactions and for claiming more in unreimbursed expenses then he had incurred that year. *See generally* Indictment.

## III.   ARGUMENT

### A.   Legal Framework

#### 1.   *Garrity immunity*

"No person shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  That right—enshrined in the Fifth Amendment—"serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances." *Garrity*, 385 U.S. at 496 (internal citation and quotation marks omitted).

So that the Fifth Amendment is not "reduced to a hollow mockery," *see id*. at 499–500, when a public employer orders an employee to answer questions under the threat of "severe employment sanctions," statements made under that threat are "deemed categorically coerced, involuntary, and inadmissible in subsequent criminal proceedings." *United States v. Palmquist*, 712 F.3d 640, 645 (1st Cir. 2013); *see also Garrity*, 385 U.S. at 500. So too are the "fruits" of

those statements. *See Sher v. U.S. Dep't of Veterans Affairs*, 488 F.3d 489, 501 (1st Cir. 2007) (citing *Gardner v. Broderick*, 392 U.S. 273 (1968)); *Garrity*, 385 U.S. at 500.

Put another way, *Garrity* immunity applies when "a government employee is threatened with an adverse employment action . . . for failure to answer questions." *Sher*, 712 F.3d at 501. And that immunity is automatic: the "very act of" questioning an employee "subject to an adverse employment action is sufficient to trigger *Garrity* immunity." *See id*., n.11 (citing *Uniformed Sanitation Men,* 426 F.2d 619, 621 (2d Cir. 1970) (recognizing *Garrity* immunity where employees told they were "subject to disciplinary action" for failure to answer questions).

### 2. *The scope of Garrity immunity*

The scope of *Garrity* immunity is equivalent to the immunity afforded under *Kastigar v. United States*, 406 U.S. 441 (1972). *See* 3 Crim. Proc., *Garrity Immunity* § 8.11(f) (collecting cases); *see also In re Grand Jury Subpoena (Stover)*, 40 F.3d 1096, 1102 (10th Cir. 1994). *Garrity* immunity thus prohibits the Government from using "compelled [statements], as well as evidence derived directly and indirectly therefrom." *Kastigar*, 406 U.S. at 453. The Government cannot use "immunized" statements or "any evidence that was tainted—substantively derived, shaped, altered, or affected—by exposure to the immunized" statements. *United States v. Slough*, 641 F.3d 544, 550 (D.C. Cir. 2011) (citing *United States v. North*, 910 F.2d 843, 854 (D.C. Cir. 1990) (*North I*), *opinion withdrawn in part*, *United States v. North*, 920 F.2d 940 (D.C. Cir. 1990) (*North II*)). Nor can the Government use "immunized" statements to "develop investigatory leads, to focus an investigation on a witness, or to motivate another witness to give incriminating testimony." *See Slough*, 641 F.3d at 550 (quoting *Kastigar*, 406 U.S. at 60; citing *United States v. Rinaldi*, 808 F.2d 1579, 1584 n.7 (D.C. Cir. 1987)).

### 3. *The Government's heavy burden*

Once a defendant demonstrates that immunity attached, the Government has the "burden of showing" that its "evidence is not tainted." *Kastigar*, 406 U.S. 460. Carrying that "heavy burden" requires more than simply negating taint. *See id*. The Government has an affirmative duty to prove the evidence it proposes to use is derived from a "legitimate source wholly independent" of the *Garrity*-protected statements. *See id*. That proof most commonly is tested at a pre-trial evidentiary (*Kastigar*) hearing at which the Government "must demonstrate that each step of the investigative chain through which the evidence was obtained is untainted." *United States v. Schmidgall*, 25 F.3d 1523, 1258 (11th Cir. 1994); *North I*, 910 F.2d at 854; *see also* LaFave, et al., 3 Crim. Proc., *Applying the use/derivative-use prohibition* § 8.11(c) (4th ed.).

### B. The Statements Captain Wagner Made During his Kroll interview were Cloaked with *Garrity* Immunity.

"*Garrity* involved an investigation into alleged irregularities . . . in which . . . police officers were told that if they did not answer questions, they would be subject to removal from office." *See Sher*, 488 F.3d at 501. That is the situation Captain Wagner faced here. Both the order and threat of job loss originated from Captain Wagner's ultimate superior: Town Manager Dillon. *See* Ex. D at WAGNER_00002221. Captain Wagner's direct supervisor, Deputy Chief Morin, took Town Manager Dillon's order and threat of discipline seriously, and acted accordingly. Morin Decl. ¶¶ 16–22.

To fulfill Town Manager Dillon's order, Deputy Chief Morin ordered Captain Wagner to comply with Kroll or be terminated. *Id*. ¶ 23. By the time of his Kroll interview, both Town Manager Dillon and Deputy Chief Morin ordered Captain Wagner to cooperate with Kroll. *See id*. ¶ 23; Ex. D at WAGNER_00002221. Deputy Chief Morin made clear that any refusal to heed the directive, including during the interview, would result in termination or a severe employment

sanction. Morin Decl. ¶¶ 21, 22, 23. Like the defendant in *Sher*, Captain Wagner was directed to "furnish information" to Kroll investigators under the threat that his "refusal to" do so "in connection with [the Kroll] investigation" would be "ground[s] for disciplinary action." *See* 488 F.3d at 502. "This notification was a threat of removal sufficient to constitute coercion under *Garrity*." *See id.*; *see also Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1293 (11th Cir. 2000) (recognizing the "heightened need for order" in a "quasi-military organization" such as a law enforcement agency); *Garrity*, 385 U.S. at 496 ("Subtle pressures may be as telling as coarse and vulgar ones.").

Nothing Mr. Linskey did or said during the interview eliminated the compulsion. Kroll's approach with Captain Wagner, for example, was the opposite of what happened in *Palmquist*. *See* 712 F.2d at 643–44. In that case, the investigator—"*before* asking *any* questions"—told the defendant he would be questioned about "allegations" of potential criminal conduct and that the defendant would not be "punished for refusing to answer questions." *See id.* (emphasis added). The Kroll investigators gave Captain Wagner no such warning. *Compare* Ex. N *with* Wagner Tr.

Yet they knew, from the outset, that Captain Wagner was under an order to answer their questions and that some of their questions concerned allegations of criminal conduct. *See* Ex. D at WAGNER_00002221; *see generally* Wagner Tr. However, unlike in *Palmquist*, Mr. Linskey misrepresented the scope of Captain Wagner's interview when it started, then ambushed him with incriminating questions at the end. *See* Wagner Tr. 146–49. On only one question—the one concerning FFL status—Mr. Linskey alluded opaquely to Captain Wagner's ability to answer, not answer, or "whatever." *See id.* 147:23–24. But he said nothing about Captain Wagner's Fifth Amendment right or whether his responses could be used in a subsequent criminal proceeding. *Cf. Palmquist*, 712 F.2d at 643–44; *see* Wagner Tr. 146–47. Nor did he claim that Captain Wagner no

longer was under the orders and threats of termination made by Town Manager Dillon and Deputy Chief Morin. *See* Wagner Tr. 146–47. Captain Wagner therefore remained "between the rock and the whirlpool." *See Garrity*, 385 U.S. at 496.

Because, "[p]olicemen," like Captain Wagner, "are not relegated to a watered-down version of constitutional rights," *Garrity*, 385 U.S. at 500, the Court should find that Captain Wagner's statements during the Kroll interview were coerced and thus "cloaked with *Garrity* immunity." *See* LaFave, et al., 3 Crim. Proc., *Garrity Immunity* § 8.11(f) n.118.

### C.   The Evidence and Witnesses Against Captain Wagner are Tainted.

At the end of their nearly three-hour probe, Kroll investigators extracted five incriminating statements from Captain Wagner. First, Captain Wagner stated that he did not have a FFL. Second, Captain Wagner acknowledged that he "purchased a number of guns" from Sig Sauer, not Smith and Wesson. Third, in response to an allegation that he sold the firearms he purchased from Sig Sauer, Captain Wagner referenced having a "close friend" who was an FFL. Fourth, Captain Wagner claimed he knew the "firearms laws well." Fifth, Captain Wagner defended his conduct by stating that he "never violated a firearms law." Wagner Tr. 147:13–25; 148:1–25; 149:1–10. Because Captain Wagner has demonstrated that these statements were made under the threat of "severe employment sanctions" and thus "coerced and involuntary," *see Palmquist*, 712 F.3d at 645, the Government must prove that all of its evidence and witnesses are traceable to a "legitimate source wholly independent" from Captain Wagner's compelled statements. *Kastigar*, 406 U.S. at 460. The Government cannot.

#### 1.   *There was no effort to prevent access to and use of immunized statements.*

Neither the federal nor state authorities were conducting a criminal investigation of Captain Wagner's firearm transactions or tax returns before his Kroll interview on May 22, 2018. As Kroll

investigators admitted, before interviewing Captain Wagner, they had heard only "rumors" about his firearm transactions. Wagner Tr. 147:13–20. Kroll acknowledged that its questions were, in part, aimed at determining the legitimacy of its source and the rumors. *See id.*

Put in evidence parlance, at the time of Captain Wagner's interview, Kroll asked questions based on hearsay from an unknown source with unknown credibility. Captain Wagner's compelled statements about his firearm transactions were essential to grounding Kroll's speculation in fact. Each statement—had they been made voluntarily—amounted to a potential party admission. Those admissions triggered the criminal investigation. But since they were coerced, the Government's use of them and their fruits violated the constitution.

The Government did nothing to prevent that violation.[2] At minimum, the Government knew or should have known that Captain Wagner's Kroll interview was cloaked with *Garrity* immunity. Yet none of the procedures routinely used to safeguard a defendant's Fifth Amendment right in this context were used. *Cf. In re Grand Jury Subpoena* 75 F.3d 446, 448 (9th Cir. 1996) (describing the use of personnel "not involved in the investigation or prosecution" to pre-screen and redact privileged testimony before it reaches the "grand jury or prosecuting attorneys"); *In re Grand Jury Subpoena (Stover)*, 40 F.3d at 1103 (emphasizing the import of "procedural protections" in which investigators untethered to the case "sanitize" internal affairs reports "by redacting statements and fruits of statements . . . which *could violate* the standards of use immunity.") (emphasis added).

This failure appears to reflect an overall lack of institutional knowledge within the NHAG about the *Garrity* doctrine. Neither the current nor past editions of the NHAG's Public Integrity

---

[2]   The Government includes all "federal state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant." *See* J.M. 9-5.001(B)(2) (citing *Kyles v. Witley*, 514 U.S. 419 (1995)).

Investigations Policies & Procedures document (2019), NHAG Law Enforcement Manual (2020), or the NHAG Guide for New Prosecutors (2021) mention *Garrity* or what it proscribes.[3] That NHAG attorneys and investigators are investigating public integrity matters under a policy that says nothing about *Garrity* may explain the glaring constitutional violation here.

Indeed, the Government used Captain Wagner's compelled statements and their fruits with reckless disregard for his constitutional rights. On November 21, 2018, the Town published redacted versions of Kroll's reports and the addendum.[4] These publically-available versions included information confirming that SPD's management was under a direct order to cooperate with Kroll and that such cooperation included transcribed interviews. Ex. B; Ex. C; Ex. D.

On November 30, 2018, the unredacted reports and Kroll's "supporting investigative material and data" were subpoenaed which, though already apparent, Town Manager Dillon confirmed would be "inclusive of transcripts of interviews [and] recordings of interviews" Ex. L; Ex. M. By December 13, 2019, Town Manager Dillon was ready to transfer the interview transcripts to the NHAG. Ex. O.

A month later, he and Mr. Pattullo met with NHAG attorneys and investigators to discuss Kroll's investigation and findings of criminal activity. *See* Ex. P. A few weeks later, Town Manager Dillon produced Captain Wagner's compelled audio-recorded and transcribed interview to Investigator Gilbert. Ex. Q. *The next day*, Investigator Gilbert focused a criminal investigation on Captain Wagner. Ex. R. That investigation started with records of Captain Wagner's Sig Sauer

---

[3]   N.H. Dep't of Justice, Office of the Attorney General, *Law Enforcement Manual* (Nov. 2020 ed.), *available at* https://www.doj.nh.gov/criminal/documents/law-enforcement-manual.pdf; Memo from MacDonald, G. to All Law Enforcement Agencies, *Public Integrity Matters* (Jan. 30, 2019), *available at* https://www.doj.nh.gov/criminal/documents/public-integrity.pdf; N.H. Dep't of Justice, Office of the Attorney General, Guide for New Prosecutors (2021) (on file with author).

[4]   *See supra* n.1.

firearm transactions which, when combined with his compelled statements, led the Government to his tax returns. *See id.*; Ex. T; Ex. U; Ex. V; Ex. W.

### 2.   *The evidence and witnesses are tainted*.

The Government used Captain Wagner's compelled statements to focus its investigation on him, his firearm transactions, and his tax returns in violation of the Fifth Amendment. These uses have tainted all of the evidence and witnesses in the case. A sampling of such uses sufficiently demonstrates the breadth of the taint.

First, the Government improperly used Captain Wagner's compelled statements to take its first investigatory step in this case: obtain purchase records from Sig Sauer. The day after he received Captain Wagner's coerced statements, Investigator Gilbert contacted Sig Sauer to request the Captain's purchase history. Ex. R. Sig Sauer, within two days of Investigator Gilbert's request, had prepared and produced a spreadsheet of Captain Wagner's purchase history *for* the criminal investigation. *See id.* In other words, the spreadsheet was not a record kept in the normal course, but instead was developed to support the Government's investigation. *See id.* ATF Special Agent Cook relied on that Sig Sauer spreadsheet to prepare his first report "summarizing a series of suspicious firearm purchases made by" Captain Wagner and included it as an attachment, which he called the "Summary of Law Enforcement Discount." *See* Ex. T at Report No. 1.

The information in that spreadsheet—created only after Investigator Gilbert requested it, which was only after he had Captain Wagner's compelled statements—is at the core of the Government's indictment. The spreadsheet provided:

- firearm make and model ("Sig Sauer," Indictment ¶ 3);

- purchase dates ("On various days between on or about December 23, 2012 and January 23, 2013," *id.*);

- how many and for how much ("WAGNER purchased 28 of the approximately 36 assault rifles at a 25 percent discount," *id.* ¶ 4);

- whether and how many times a law enforcement discount was applied (*id.*);

- whether and when Captain Wagner stopped receiving the law enforcement discount ("WAGNER purchased approximately 6 additional assault rifles without the law enforcement discount," *id.* ¶ 5); and

- the discount value per purchase and overall ("With the law enforcement discount, WAGNER saved more than $10,000, paying approximately $40,567.50 for the 28 assault rifles," *id.* ¶ 4).

<u>Second</u>, the Government used Captain Wagner's compelled statements and their fruits as criminal "investigatory leads" to develop more evidence of his firearm transactions and the income he earned from them. *Cf. Kastigar*, 406 U.S. at 460. Captain Wagner admitted to Kroll investigators that he was not an FFL, but stated that he had a "close friend" who was. Identifying that "close friend" became a critical lead for the criminal investigators to pursue.

Using the Sig Sauer records, the Government identified an individual living in Maryland (Ryan Reynolds) who had a firearm that was originally purchased by Captain Wagner. Ex. T at Report No. 3. The Government then identified the FFL in Maryland through which that firearm was transferred, obtained access to that company's Acquisition & Disposition log, and determined the firearm was transferred there from an FFL in New Hampshire: On Target Guns. *See id.* at Reports Nos. 3, 4. Shortly after, Special Agent Cook and Investigator Gilbert interviewed the owner of On Target Guns, key Government witness: Deputy Sheriff Gary Fisher.[5]

---

[5]  Identifying Captain Wagner's transaction with Mr. Reynolds should also have been when the Government identified there were serious flaws with an essential component of its theory—that is, that Captain Wagner allegedly was willfully engaged in the business of dealing firearms without a license. Consistent with the carelessness with which it handled Captain Wagner's compelled statements, the Government appears also to have disregarded clear evidence of Captain Wagner's then-existing innocent mental state.

<u>First</u>, in email correspondence with Mr. Reynolds, Captain Wagner stated that he would *not* "knowingly violate any laws" just to sell Reynolds a firearm. Ex. EE, Emails between Wagner, M. and Reynolds, R. (Dec. 31, 2012). That email was sent as the two were conferring about whether their transaction could happen under various state laws. It was not concocted when, for example, Captain Wagner discovered he was under criminal investigation.

That interview focused on Deputy Sheriff Fisher's dealings with Captain Wagner, including specifically asking whether he and Captain Wagner were friends—a direct tie-in to Captain Wagner's Kroll interview. *See* Ex. U; Wagner Tr. 149:1–10. Deputy Sheriff Fisher gave investigators his Acquisition & Disposition log book and receipts for his transfer services. Ex. T at Report No. 5. He also stated that he believed Captain Wagner profited from his gun sales because, at the time, Sig Sauer firearms were selling for twice their retail value. *See id.* Fisher testified before the state grand jury on these same subjects. *See* Ex. X.

By using Captain Wagner's statements and their fruits to identify Deputy Sheriff Fisher, the Government confirmed its suspicion that Captain Wagner resold the Sig Sauer firearms he purchased. *See* Ex. T at Report No. 1. From the Sig Sauer spreadsheet, the Government knew that Captain Wagner purchased the firearms using Sig Sauer's law enforcement discount. Ex R. From Deputy Sheriff Fisher, the Government knew that Sig Sauer firearms were selling at twice their normal value. *See* Ex. T at Report No. 5. The Government knew that Captain Wagner was selling them online, transferring them through Fisher, whose company was a registered FFL. *See id.* And the Government knew that, because of the law enforcement discount and demand, Captain Wagner likely earned an income from those sales. *See id.*

Third, the Government used Captain Wagner's compelled statements and their fruits to focus its investigation on his tax returns. On April 1, 2019, the same day AUSA Gallagher received Special Agent Cook's reports about Captain Wagner's firearms transactions, the Government also

---

Second, Deputy Sheriff Fisher knew everything Captain Wagner was doing—buying firearms from Sig Sauer at a discount then selling them online—because Fisher was essential to those transactions. *See* Ex. T at Report No. 5. Deputy Sheriff Fisher transferred all of Captain Wagner's firearms to buyers using On Target Gun's FFL. Captain Wagner hid nothing from Deputy Sheriff Fisher because he acted consistent with the advice the Deputy Sheriff admitted that he likely gave Captain Wagner. *See* Fisher Tr. 172:6–17 ("I can tell you my practice . . . I tell anybody[,] New Hampshire allows for private sales. . .I tell anybody that wants to do a private sale that they should do it through a dealer. . .Could I have told [Captain Wagner] something like that? Absolutely.").

was strategizing on how to charge Captain Wagner under the tax law. *See* Ex. V. IRS Special Agent Fornash was part of that strategy discussion, and the next day, April 2, 2019, the Government obtained Captain Wagner's tax returns. *See* Ex. V, Ex. W. As Special Agent Cook's email then, the Government's tax record collection immediately after, and the indictment now demonstrate, the tax charge is inextricably intertwined with the tainted evidence of Captain Wagner's firearm transactions. *See* Ex. V; Ex. W; Indictment. The Government never would have investigated Captain Wagner's 2013 tax return—the income allegedly unreported and the deductions allegedly improperly taken—had it not been investigating his firearm transactions. And that investigation was unconstitutionally "focused," "substantively derived," and "shaped," by Captain Wagner's compelled statements. *See Slough*, 641 F.3d at 550; *Kastigar*, 406 U.S. at 453.

These uses bear no resemblance to those alleged in *United States v. Serrano*, 870 F.2d 1 (1st Cir. 1989). There, the defendant sought dismissal because the lead investigator watched the immunized testimony on television, videotaped and transcribed it, then provided copies to the prosecutor in charge. *Id*. at 13. "The federal investigation that led to the indictment" began "nearly a year before" the immunized testimony. *See id*. The grand jury already had "subpoenaed numerous documents" and the investigators already had "interviewed numerous witnesses," including the defendant. *See id*. at 15 ("90 percent of [the] investigation in [the] case had been completed by the time [the defendant] gave his immunized testimony."). The defendant's "immunized statements" therefore neither provided "additional evidence" nor "trigger[ed] [] additional investigation." *Id*.

The United States Court of Appeals for the First Circuit upheld the district court's denial. It determined that the investigator's limited reference to immunized testimony before the grand jury was "clearly improper." *See id*. at 16. The Court of Appeals nevertheless affirmed "given the

27

substantial untainted evidence presented to the grand jury and the tangential nature of the reference in relation to the indictment returned in this case." *Id.*

The opposite is true here. There was no criminal investigation into Captain Wagner's firearm transactions or tax returns before the Government obtained his compelled statements. Those immunized statements, unlike in *Serrano*, became the first piece of evidence and the Government's first "trigger" to investigate. *See id.*; *see also* Ex. V (suggesting that AUSA Gallagher just started working the investigation and had to "hit the ground running on this."). The Government received Captain Wagner's immune statements and used them to "focus" a criminal investigation on him. *Cf. Kastigar*, 406 U.S. at 460. The firearm transactions and tax "evidence obtained by focusing investigation on [Captain Wagner] as a result of his compelled disclosures" therefore must be barred from use in this case. *See id.* And because that evidence is at the heart of the Government's indictment—as the allegations in the indictment itself reveal—the indictment must be dismissed.

## IV.    CONCLUSION

Captain Wagner was compelled, under the threat of job loss, to make incriminating statements to the Town of Salem's agent, Kroll. Although those statements were immunized under *Garrity*, the Government used them to focus a criminal investigation on him, his firearm transactions, and tax returns. The witnesses and evidence resulting from the Government's unconstitutional use of compelled statements all are tainted. The Government did nothing to prevent that taint from infecting the entire prosecution team and thus this case.

The Government now must demonstrate that its evidence came from a "legitimate source wholly independent" of Captain Wagner's compelled statements. Unless the Government has withheld a significant body of evidence, based on the records Captain Wagner has received through

discovery and Right-to-Know requests, the Government will fall short of meeting its heavy burden. When it does, the Court should dismiss the indictment.

## V.      RELIEF REQUESTED

### A.      Pre-Trial *Kastigar* Hearing

Because Captain Wagner has raised legitimate reasons to believe that all of the witnesses and evidence used before the grand jury and which the Government likely will use at trial are tainted, he respectfully requests that the Court schedule a pre-trial *Kastigar* evidentiary hearing and attendant briefing schedule.

### B.      Dismissal of the Indictment

Captain Wagner respectfully requests that, after the briefing and evidentiary hearing are completed, the Court dismiss the indictment because it was obtained in violation of his Fifth Amendment right as established in *Garrity* and *Kastigar*.

### C.      Grant such other relief as this Court deems just and equitable.

Date: October 5, 2021                    Respectfully Submitted,


                                          **NIXON PEABODY LLP**

                                          */s/ David A. Vicinanzo*
                                          David A. Vicinanzo (NH Bar No. 9403)
                                          Michael E. Strauss (NH Bar No. 266717)
                                          900 Elm Street, 14th Floor
                                          Manchester, NH 03101
                                          (603) 628-4000
                                          dvicinanzo@nixonpeabody.com
                                          mestrauss@nixonpeabody.com


                                          Mark D. Lytle (*pro hac vice* forthcoming)
                                          799 9th Street NW, Suite 500
                                          Washington, DC 20001
                                          (202) 585-8000
                                          mlytle@nixonpeabody.com


                                          *Counsel for Defendant Michael J. Wagner*


<u>**CERTIFICATE OF SERVICE**</u>

    I, David A. Vicinanzo, hereby certify that on this 5th day of October, 2021, a true and accurate copy of the foregoing *Motion to Dismiss the Indictment with Incorporated Memorandum of Law* was filed through the ECF system and served electronically on the registered participants as identified on the Notice of Electronic Filing (NEF).

                                          */s/  David A. Vicinanzo*
                                          David A. Vicinanzo, Esq.