# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>

     v.                            Case No. 20-cr-105-PB
                                       Opinion No. 2022 DNH 106

<u>Michael J. Wagner</u>

## MEMORANDUM AND ORDER

Michael Wagner, a former Captain with the Salem Police Department (SPD), has been indicted for making a false statement in his 2013 income tax return. The government alleges that Wagner inflated his work-related tax deductions and underreported more than $30,000 he earned by reselling firearms he purchased from Sig Sauer (a firearms manufacturer) using a law enforcement discount. Before becoming a target of a criminal investigation, Wagner was interviewed as part of an internal affairs investigation of the SPD initiated by the Town of Salem. In a recorded interview, Wagner made some limited statements concerning his firearm purchases. I previously determined that those statements were made under the threat of losing employment and were thus immunized under Garrity v. New Jersey, 385 U.S. 493 (1967), which held that Fifth Amendment protections apply to public

employees who, under the threat of job loss, are required to make incriminating statements.

Wagner's <u>Garrity</u> immunity now precludes the government from using his statements or any evidence derived from them when seeking an indictment or a conviction. The government did not use Wagner's statements in securing a superseding indictment and will not use them at trial. Having settled the immunity question, I must now decide whether the government has met its "heavy burden" of proof under Kastigar v. United States, 406 U.S. 441 (1972), to show that the evidence it proposes to use is derived from a legitimate source entirely independent of Wagner's compelled statements.

## I.   <u>BACKGROUND</u>[1]

The superseding indictment charges Wagner with one count of submitting a false and fraudulent tax return in violation of 26 U.S.C. § 7206(1). The government intends to prove at trial that Wagner purchased thirty-six assault rifles from Sig Sauer between December 2012 and January 2013, typically using a twenty-five percent discount offered to law enforcement officers. He allegedly resold thirty-three of those rifles over the internet, earning more than $33,000 in profit. When Wagner later filed his 2013 tax return, he allegedly omitted the income from his online firearm

---

[1]     These findings of facts are based on the evidence I received at the <u>Kastigar</u> hearing on June 21, 2022.

sales and falsely claimed more than $10,000 in unreimbursed business expenses for firearm and ammunition purchases. As a result, the government claims he avoided paying about $11,000 in income taxes.

Wagner's firearms dealings were no secret at the SPD. Some of his fellow officers complained repeatedly about those dealings to the Salem Manager Christopher Dillon. Sergeant Chad Clark and two other SPD officers approached Dillon individually to raise concerns about Wagner purchasing guns at Sig Sauer and reselling them. Dillon was aware of this complaint before he hired a risk management firm, Kroll Inc., in late February 2018 to audit the SPD's internal affairs process, which for years had been seen as irredeemably flawed by various Town stakeholders.

As part of the audit, Daniel Linskey, Kroll's primary investigator, interviewed SPD command staff, including Wagner, in May 2018. Before the interviews, Linskey received a private Twitter message from a law enforcement contact informing him that Sergeant Clark had complained during a union meeting that Wagner had bought numerous firearms at Sig Sauer with a police discount and made $32,000 in one month from reselling them.[2] The same source told Linskey of a rumor that Wagner had purchased

---

[2]   The name of the complaining sergeant is redacted in the Twitter message in the record. <u>See</u> Doc. No. 47–2. The government has represented, without objection from Wagner, that the person identified in the message is Sergeant Clark.

a retired SPD cruiser through an intermediary and later resold it for a significant profit.

Linskey first asked SPD Chief Paul Donovan about the rumors during his audit interview. When asked about his officers reselling discounted firearms from Sig Sauer, Donovan responded that he knew Wagner had bought some at one point. Donovan was not aware of Wagner's cruiser purchase.

Linskey then asked Wagner about the cruiser and the firearm sales at the end of his interview. Wagner confirmed that he had bought an SPD cruiser in a private sale, but he would not discuss its resale. In response to questions about his gun purchases, Wagner stated that he had bought firearms from Sig Sauer but insisted that it was his "private business" that he did not want to discuss. Wagner also confirmed that he did not have a federal firearms license (FFL) to deal in firearms, but he volunteered that a "close friend" had an FFL.

The Kroll report was published in November 2018. The report focused on the SPD's internal affairs, time and attendance practices, and overall culture. It made no reference to Wagner's firearm or cruiser purchases. Chief Donovan left shortly after the report came out, and the Town engaged Brian Pattullo to oversee the SPD as Civilian Administrator in early December.

Pattullo learned about Wagner's profiteering from firearm sales from Sergeant Clark during a "ride along" in mid-December. One of the issues Clark asked Pattullo to investigate was Wagner's purchase of guns from Sig Sauer with a police discount. At some later point, Wagner himself volunteered during a casual conversation with Pattullo that he had bought firearms from Sig Sauer and insisted that he had done nothing wrong. Dillon, the Town Manager, later shared the same information with Pattullo.

When Pattullo did not take immediate action to address Clark's complaints, Clark went to the Town HR Director Anne Fogarty in late December. Among several concerns Clark aired was that Wagner had bought firearms with a law enforcement discount and earned about $40,000 in profit when he resold them. Clark later repeated his allegation during a January 2, 2019 meeting with Fogarty and Dillon and at a January 9, 2019 meeting with SPD Sergeants and Lieutenants.

Meanwhile, the Office of the New Hampshire Attorney General (NHAG) had begun to investigate the SPD after the American Civil Liberties Union flagged issues identified in the Kroll report. Pattullo and Dillon first met with NHAG investigators and prosecutors, including Investigator Scott Gilbert, on January 14, 2019. Dillon had a written list of topics to cover that Fogarty had prepared for him, which included Wagner's firearm sales. During the meeting, Pattullo and Dillon discussed various allegations about

potential criminal activity by SPD officers, including Clark's allegation that Wagner had resold firearms purchased from Sig Sauer with a police discount. This was when Gilbert first learned about the firearms complaint. Other allegations about Wagner that were discussed during the meeting included his purchase and resale of a retired SPD cruiser and his role in the removal of internal affairs files.

The attorneys spearheading the SPD investigation informed Gilbert that every allegation brought up at the meeting needed to be investigated. They discussed investigating Wagner's firearm purchases for a possible violation of the Official Oppression statute, a state law against misuse of public office for personal gain, see N.H. Rev. Stat. Ann. § 643:1, as well as the possibility of referring the matter to their federal counterparts for potential violations of federal gun laws.

Gilbert and a fellow investigator first turned their attention to the cruiser issue and the missing internal affairs files, both of which were more recent than the firearm sales. But Gilbert's focus was redirected to the firearm sales on February 6, 2019, when he obtained the transcript of Wagner's interview with Kroll. The transcript confirmed the allegation Gilbert had previously heard that Wagner was buying discounted guns from Sig Sauer. The only new information Gilbert learned from reading the transcript was that Wagner did not have an FFL but had a "close friend" who

did, and that Wagner was hesitant to discuss his gun purchases because he considered them to be his "private business."

Within hours of receiving the transcript, Gilbert asked Sig Sauer for records of Wagner's firearm purchases. Sig Sauer provided him with two spreadsheets listing thirty-six rifles that Wagner had bought between December 23, 2012, and January 22, 2013. The more detailed spreadsheet showed the list price, the sale price, and the twenty-five percent law enforcement discount applied to most purchases. The serial numbers, however, were not included in either spreadsheet.

A few days later, the NHAG's office contacted the FBI about possible federal criminal violations stemming from Wagner's firearms dealings. Gilbert forwarded Sig Sauer's detailed spreadsheet to the FBI on February 15, along with a report he had drafted at the FBI's request discussing some of the relevant evidence. Gilbert's report summarized Wagner's statements from the Kroll interview and noted that there was a rumor at the SPD that Wagner's "FFL friend" referenced in the Kroll interview was named Gary Fisher.

The FBI, in turn, forwarded the Sig Sauer spreadsheet, but not Gilbert's report, to the ATF. Special Agent John Cook of the ATF decided to open an investigation on suspicion that Wagner was dealing firearms without a license. As part of his investigation, Cook determined via a database check

that Wagner did not have an FFL. Cook then obtained Wagner's ATF Form 4473 records from Sig Sauer, which contained serial numbers that allowed Cook to trace the rifles. He eventually learned that one of the rifles had ended up in Maryland and had been sold by On Target Guns, a New Hampshire gun shop owned by Gary Fisher.

In late March, Agent Cook and Investigator Gilbert interviewed Fisher. Fisher confirmed that Wagner had sold the rifle to a purchaser in Maryland and that Fisher had transferred the weapon on Wagner's behalf. According to Fisher, Wagner had sold multiple rifles over the internet on gunbroker.com during a brief period of high demand[3] and was using On Target Guns to transfer the weapons to his buyers. Fisher turned over a copy of his Acquisition and Disposition Book, as well as invoices of his transactions with Wagner. These documents — along with the ATF Forms 4473, Wagner's financial records, and the gunbroker.com records — are the primary evidence the government plans to use to prove Wagner's firearm transactions.

Based on the records obtained from Fisher and Sig Sauer, Agent Cook also learned that SPD Officer Sean Marino had purchased a rifle from Sig Sauer that Wagner then resold. Cook suspected that Marino was a straw

---

[3]    Agent Cook testified that Wagner sold the firearms shortly after the Sandy Hook school shooting, when prices for assault rifles doubled based on speculation that an assault weapons ban was imminent.

purchaser for Wagner. Investigator Gilbert, meanwhile, heard from Pattullo, the SPD's Civilian Administrator, that Marino may have some information about Wagner's firearm purchases. When Gilbert later interviewed Marino, Marino stated that Wagner had once given him a direct order to go to Sig Sauer and pick up a rifle for him.

By early April 2019, investigators determined that Wagner's firearms dealings were outside the five-year statute of limitations for possible gun charges. The IRS was then brought in as the investigation pivoted to possible tax crimes with a longer limitations period. IRS Special Agent Dan Fornash learned of Wagner's Kroll interview early on in his investigation. Fornash referenced Wagner's statements in his requests to open a criminal investigation and later to charge Wagner with filing a false tax return. Wagner's interview transcript was also presented to the first grand jury that heard evidence of Wagner's tax law violations. But the government subsequently obtained a superseding indictment from a different grand jury that avoided any reference to Wagner's statements.

Wagner moved to dismiss the indictment on the ground that the government violated his <u>Garrity</u> rights because it improperly used his immunized statements and their fruits to investigate and prosecute this case. I bifurcated the motion into two phases. First, I held an evidentiary hearing to determine whether the limited statements Wagner made during the Kroll

interview were compelled under Garrity. I concluded that Garrity applied because Wagner's superiors had told him that he would lose his job if he did not participate in the interview, which he understood to mean that he had to answer Linskey's questions. I later held a Kastigar hearing to give the government a chance to prove that the evidence it intends to introduce at trial, and that it used to secure the superseding indictment, came from legitimate sources wholly independent of Wagner's immunized statements. As discussed below, I find that the government has carried its burden under Kastigar to prove that the evidence against Wagner is not tainted.

## II.   STANDARD OF REVIEW

The Fifth Amendment provides that "no person shall be compelled in any criminal case to be a witness against himself." In Garrity v. New Jersey, the Supreme Court held that the privilege against self-incrimination precludes the government from "us[ing] the threat of discharge to secure incriminatory evidence against an employee." 385 U.S. 493, 499–500 (1967). When an employee must choose between self-incrimination and loss of a public job, "his statements are deemed categorically coerced, involuntary, and inadmissible in subsequent criminal proceedings." United States v. Palmquist, 712 F.3d 640, 645 (1st Cir. 2013). Under those circumstances, eliciting incriminating testimony automatically triggers a grant of use

immunity under Garrity. Sher v. U.S. Dep't of Veterans Affs., 488 F.3d 489, 502 (1st Cir. 2007).

Once a defendant shows that Garrity applies, the burden shifts to the government to prove that the evidence it proposes to use is not tainted by the immunized testimony. Kastigar v. United States, 406 U.S. 441, 460 (1972). This burden is "a 'heavy' one." United States v. Serrano, 870 F.2d 1, 15 (1st Cir. 1989) (quoting Kastigar, 406 U.S. at 461). Negating the possibility that the immunized testimony has tainted the prosecution is not enough. Id. at 14. Instead, the government must prove that its evidence is "derived from a legitimate source wholly independent of the compelled testimony." Id. (quoting Kastigar, 406 U.S. at 460).

Exposure to immunized testimony does not preclude the government from carrying its burden. Id. at 18; see also United States v. Nanni, 59 F.3d 1425, 1432 (2d Cir. 1995). And the existence of independent leads before the government's exposure to the immunized testimony is strong evidence that its information came from an untainted source. Nanni, 59 F.3d at 1432. When both tainted and independent sources of evidence could have motivated the government's line of investigation, "the tainted source's presence doesn't ipso facto establish taint." United States v. Slough, 641 F.3d 544, 551 (D.C. Cir. 2011). Rather, in that case, "the court must determine whether the government would have taken the same steps entirely apart from the

motivating effect of the immunized testimony." Id. (quoting Nanni, 59 F.3d at
1432). If so, no impermissible derivative use of the immunized testimony has
occurred. Id. at 551–52.

## III.   ANALYSIS

The principal dispute here is whether the government's case against
Wagner is founded on an impermissible derivative use of his immunized
testimony. The government maintains its evidence against Wagner consists
of records and witnesses that have nothing to do with his limited statements
to Kroll. Wagner argues that the government used his immunized statements
to develop investigatory leads from which all its trial evidence was derived.
Having carefully considered all of the evidence produced during the Kastigar
hearing, I find that the government has met its heavy burden of showing that
its essentially "paper" case against Wagner was derived from legitimate
sources that are entirely independent of Wagner's immunized testimony.

The government's proposed evidence against Wagner, like its evidence
before the second grand jury, consists almost entirely of records, including
Wagner's 2013 tax return and related documents, records of Wagner's
firearm purchases at Sig Sauer, records of his sales of those firearms, and his
bank statements. Besides calling the custodians of those records, the
government intends to call as witnesses: an IRS revenue agent who will
describe his analysis of Wagner's 2013 tax return and the records relating to

Wagner's firearm trades; a tax preparer who filed Wagner's 2013 tax return; Sig Sauer employees who sold the firearms to Wagner; Officer Marino who will testify about his straw purchase of a Sig Sauer rifle on Wagner's behalf; and an SPD witness who will testify that Wagner's guns and ammunition expenses claimed on his 2013 tax return were not job-related. The government contends that its record evidence comes from legitimate independent sources and that none of its witnesses have seen, been made aware of, or were otherwise influenced by Wagner's immunized statements.

The government's records and witnesses all flow from the line of investigation that NHAG Investigator Gilbert followed when he contacted Sig Sauer to request records of Wagner's firearm purchases. The Sig Sauer records prompted the NHAG to refer the matter to the FBI, which led to the ATF's investigation into the firearm sales and the IRS's inquiry into the tax consequences of those sales. The question, then, is whether Gilbert's records request to Sig Sauer was derived from Wagner's immunized statements to Kroll confirming the allegation that he had purchased guns from Sig Sauer, or from a legitimate source untainted by exposure to those statements.

As the government admits, Gilbert's review of Wagner's immunized testimony was a motivating factor in his decision to advance his investigation into Wagner's firearms dealings. Considering that Gilbert contacted Sig Sauer within hours of reading Wagner's interview transcript on February 6,

the timing alone makes the connection between the two undeniable. But the immunized testimony was not Gilbert's sole investigatory lead to Sig Sauer. The government has made a strong showing that before Gilbert read or even knew about Wagner's immunized statements, he had a prior source for the relevant information that was entirely independent of what Wagner had said during the Kroll interview. Given the government's evidence on this point, I have no doubt that Gilbert would have contacted Sig Sauer based on that prior source even if he had never learned of Wagner's immunized testimony.

Gilbert first learned that Wagner may have resold discounted firearms obtained from Sig Sauer during the January 14 meeting. His sources for the information were Dillon, who learned of the allegation from Sergeant Clark and other police officers before Wagner made his immunized statements, and Pattullo, who learned of the allegation a few weeks before the January 14 meeting during a ride along with Clark. Thus, before Gilbert learned of Wagner's immunized statements on February 6, he had learned of the allegation from sources that were untainted by Wagner's statements to Kroll.

Although the timing of Gilbert's request to Sig Sauer was no doubt influenced by his review of the immunized statements, Gilbert had an independent motivation to pursue those records and would have done so regardless of the Kroll transcript. Wagner was already a target of a multifaceted criminal investigation, with the NHAG's office investigating his

cruiser purchase and his removal of internal affairs files when the Kroll transcript came across Gilbert's desk. From the outset, before his office even knew about the transcript, Gilbert was under instruction from his superiors that Wagner's profiteering from gun sales had to be investigated. Thus, it was only a matter of time before Gilbert would have turned his attention to the firearm purchases. Because he already knew from independent sources that Wagner was buying guns from Sig Sauer, Gilbert would have asked Sig Sauer for records of Wagner's purchases as a routine part of his investigation. Gilbert's exposure to the Kroll transcript merely hastened their inevitable acquisition.

Unlike the Sig Sauer rumor, Gilbert did not know before reading the Kroll transcript that Wagner did not hold an FFL but had a close friend who did. This new information, however, was neither a source of the government's evidence nor did it influence its investigation. As for Wagner's FFL status, Agent Cook confirmed that Wagner did not hold an FFL as a routine part of his investigation. I credit Cook's commonsense testimony that confirming whether a target has an FFL is a necessary step in a gun trafficking investigation. More importantly, Cook had no exposure to the immunized testimony, so it cannot be said that his decision to check a database to confirm Wagner's FFL status was motivated by that testimony. The information that Wagner had an FFL friend, and the rumored identity of that

friend, likewise did not reach the ATF. Instead, it was the tracing of the serial numbers of the rifles Wagner had purchased that led the ATF to On Target Guns and its owner, Gary Fisher. The connection between Fisher and Wagner thus came from an independent source.[4]

In sum, the government has proved that, as part of its ongoing criminal investigation into Wagner, the NHAG's office would have obtained the Sig Sauer records based on a prior source of the information that Wagner was buying guns from Sig Sauer with a police discount and reselling them for profit. That prior source is entirely independent of what Wagner later said during the Kroll interview. The remaining evidence against Wagner followed from the Sig Sauer records as a matter of course. Accordingly, I find that the government has satisfied its "heavy burden" under <u>Kastigar</u> to establish that its evidence was not derived from Wagner's immunized testimony.

Wagner presents several arguments to support his contention that the government has failed to carry its <u>Kastigar</u> burden, none of which are

---

[4]     Gilbert also gleaned from the Kroll transcript that Wagner had described the gun purchases as his "private business." This information similarly had no meaningful effect on the investigation. At most, it conveyed Wagner's reluctance to talk about the subject. Even if Wagner's reticence suggested that he had something to hide and thus motivated Gilbert to dig deeper, I am satisfied that Gilbert would have pursued the same line of investigation without Wagner's comment, for the reasons I have already explained.

persuasive. His first line of attack is to challenge the credibility of the

government's witnesses. Wagner maintains that Gilbert, Pattullo, Dillon, and

Fogarty were either mistaken or lying when they testified that Gilbert was

told about Wagner's gun purchases from Sig Sauer at the January 14

meeting, before Gilbert's review of the Kroll transcript.[5] To support that

claim, Wagner mainly points to what he deems is prior inconsistent

testimony from Dillon, Pattullo, and Fogarty when they were deposed in a

civil defamation case brought by another SPD officer. In those depositions,

the witnesses could not recall whether they had shared the firearms

allegation with the NHAG's staff at the January 14 meeting. I have

considered that evidence but ultimately find the government's witnesses

credible. Along with observing the witnesses' demeanor on the stand, I credit

their testimony because every witness told a consistent story that finds

support in documentary evidence. The documents confirm that Sergeant

Clark had complained about Wagner's firearm sales to anyone who would

listen, and that Dillon had planned to discuss that complaint at the January

14 meeting. Further, the witnesses' inability to recall the same information

at earlier depositions has a plausible explanation. They testified that they

had spent more time reviewing documents and preparing to testify in this

---

[5]     Although Fogarty did not attend the meeting, she testified to preparing
Dillon's meeting agenda, which included Wagner's firearm sales.

case than they did for the defamation case and were thus more likely to recall the events in question.

Wagner's next argument is that Gilbert would not have contacted Sig Sauer absent his exposure to the immunized testimony because Sergeant Clark was an unreliable source of information. I disagree. To start, nothing in the record suggests that Gilbert learned at the January 14 meeting that Clark was the source of complaints about Wagner's profiteering from gun sales. But even if he had, Clark was by no means untrustworthy. Clark repeated the same allegations to various witnesses at different times, including sharing details about how much Wagner had profited from reselling the guns. That Pattullo and Dillon may have found Clark difficult to deal with, in part because of his persistence that something be done about his complaints, does not suggest that they did not take his allegations seriously or questioned his candor.

Wagner also contends that Gilbert would not have reached out to Sig Sauer without the Kroll transcript because the statute of limitations on possible gun charges had expired. This argument is meritless. Even if Gilbert had known that the limitations period on gun charges had run, nothing in the immunized statements suggested a possible tax crime that would have incentivized Gilbert to continue his investigation. In any event, Gilbert testified that his investigation was not limited to gun charges but

encompassed possible state charges under the Official Oppression statute, which had a longer limitations period.

Lastly, Wagner argues that his immunized statements were so inextricably intertwined with the criminal investigation that they necessarily tainted the government's evidence. Wagner points to several documents where the government referenced his statements to Kroll, such as Gilbert's report to the FBI, Gilbert's draft affidavit for Wagner's arrest on state misdemeanor charges, and IRS Agent Fornash's requests for internal approvals related to the tax charges. To be sure, some members of the prosecution team were exposed to Wagner's immunized statements. Because the government believed, in good faith, that Wagner's statements to Kroll were not compelled under <u>Garrity</u>, they did not establish firewalls to limit the risk of taint. But that does not preclude the government from establishing that its evidence was derived from wholly independent sources, as it has done here. <u>See</u> <u>Serrano, 870 F.2d at 17–18</u>; <u>Nanni, 59 F.3d at 1432</u>. Simply put, awareness of immunized testimony is not use of that testimony.

The government's exposure to Wagner's immunized statements was not otherwise so prejudicial as to mandate dismissal of the indictment. <u>See</u> <u>Serrano, 870 F.2d at 17–18</u> (noting in dictum the possibility that "certain nonevidentiary uses of immunized testimony may so prejudice the defendant as to warrant dismissal of the indictment"). For one, Wagner's statements to

Kroll were so limited in scope that their value as a source of information was minimal. By and large, he merely confirmed what was already well known. More importantly, this is a tax fraud case where, once the government obtained the Sig Sauer records through independent means, the rest of its evidence came about from following a paper trail. This mechanical process was not susceptible to influence from the immunized statements. Wagner's suggestion that his statements had a prejudicial effect that inexorably tainted the whole case, therefore, is unpersuasive.[6]

At bottom, Garrity and Kastigar aim to place Wagner and the government in "substantially the same position as if [he] had claimed his privilege." Serrano, 870 F.2d at 17 (quoting Kastigar, 406 U.S. at 458–59). The evidence shows that this purpose was not frustrated here. The government has satisfied its "heavy burden" under Kastigar to prove that its

---

[6]     Wagner's argument that the superseding indictment cannot undo the use of his immunized statements in connection with the original indictment similarly finds no support in the law. The evidence before the grand jury that returned the superseding indictment was not tainted. Dismissing that indictment for its predecessor's flaws would put the government in a substantially worse position than if Wagner had invoked his privilege to remain silent. That outcome would extend the Garrity use immunity far beyond its scope and render it akin to transactional immunity. See Serrano, 870 F.2d at 17; see also United States v. Byrd, 765 F.2d 1524 (11th Cir. 1985) (where the government had initially obtained an indictment against the defendant from the same grand jury that had heard the defendant's immunized testimony, concluding that the presentment of untainted evidence to a new grand jury satisfied Kastigar).

evidence against Wagner derives from legitimate sources fully independent of Wagner's immunized statements. And any nonevidentiary use of those statements was not sufficiently prejudicial to warrant dismissal of the superseding indictment.

## IV.  CONCLUSION

For the foregoing reasons, Wagner's motion to dismiss the indictment (Doc. No. 19) is denied.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

August 30, 2022

cc:    Counsel of record
       U.S. Probation
       U.S. Marshal